David M. Birka-White (State Bar No. 85721)
Stephen Oroza (State Bar No. 84681)
Thomas D. Hicks (State Bar No. 238545)
BIRKA-WHITE LAW OFFICES
744 Montgomery Street, Fourth Floor
San Francisco, California 94111
Telephone:  (415) 616-9999
Facsimile:  (415) 616-9494

Attorneys for Plaintiff Arnesha Garner

(Additional counsel listed on signature page)

# UNITED STATES DISTRICT COURT

# NORTHERN DICSTRICT OF CALIFORNIA

| | |
|---|---|
| ARNESHA GARNER, on behalf of herself and all others similarly situated, | Case No. C 08-01365 CW |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY'S MOTION TO COMPEL CONTRACTUAL APPRAISAL AND FOR A STAY PENDING APPRAISAL** |
| vs. | |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, et al., | |
| Defendants. | **JUDGE: Claudia Wilkin**<br>**DATE:    May 22, 2008**<br>**TIME:    10:00 a.m.**<br>**DEPT.:   2, 2nd Floor** |

1

TABLE OF CONTENTS

2

Page

3   I.   INTRODUCTION ...................................................................................................1

4   II.  STATEMENT OF FACTS .....................................................................................2

5        A.   Industry Resistance To The Total Loss Regulation And The Filing Of Personal
             Insurance Federation v. Garamendi ............................................................2

6        B.   Settlement Of The Total Loss Lawsuit And The Availability Of DMV Sales Data ......3

7        C.   State Farm's Offer To Settle Plaintiff's Claim And Communications Related Thereto 4

8        D.   The Mitchell Valuation .................................................................................5

9        E.   The Appraisal Provision and Process ...........................................................7

10  III. SUMMARY OF ARGUMENT ............................................................................9

11  1.   For the reasons stated below, the appraisal provisions of the policy are not enforceable
         against Plaintiff or the Class.: ...........................................................................9

12

13  IV.  ARGUMENT .......................................................................................................12

14       A.   THE FAA DOES NOT APPLY TO THIS CASE ......................................12

15       B.   Even Were the Appraisal Provision of the Policy Enforceable against Plaintiff and the
             Class it Would Not Apply to the Claims Asserted Herein .............................12

16       C.   The State Farm Appraisal Provision Does Not Cover This Dispute ............12

17            2.   Nothing In The Total Loss Regulation Supports State Farm....................17

18       D.   Even If the Appraisal Provision Covered the Dispute in This Case, It Would Not Be
             Enforceable Against Plaintiff Or The Class ................................................18

19

20            1.   State Law Governs Defenses To Appraisal Provisions .............................18

21            2.   State Farm Is Precluded From Enforcing The Appraisal Provision Because Of Its
                 Breach of the Covenant of Good Faith and Fair Dealing ....................18

22            3.   The Appraisal Provision Is Unconscionable...........................................20

23       E.   If The Court Believes That There are Factual Issues Which Must Be Resolved In
             Order to Address The Issues Raised In This Motion, An Evidentiary Hearing Should Be
             Held To Resolve Them. ................................................................................22

24

25  V.   CONCLUSION....................................................................................................24

26

27

28

BERDING & WEIL LLP
3240 Stone Valley Road West
Alamo, California 94507

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Circuit City Stores, Inc. v. Adams*, 279 F.3d 889 (9th Cir.2002)....................................18

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995) ............................12, 18

*Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1171 (9th Cir. 2003) ......................20

## STATE CASES

*Bono v. David*, 147 Cal. App. 4th 1055 (2007) ........................................................12

*Chase v Blue Cross*, 42 Cal. App. 4th 1142, 1151-52, 1155-56 (1996) .........................11, 18, 19

*Community Assisting Recovery, Inc., v. Aegis Security Insurance Company*, 92 Cal.
    App. 4th 886, 891, 893-94, 895 (2001) ..............................................................10, 15, 16

*Discover Bank v. Superior Court* (2005) 36 Cal. 4th 148............................................20

*Efund Capital Partners v. Pless*, 150 Cal. App. 4th 1311 (2007)................................12

*Egan v. Mutual of Omaha Insurance Co. (1979)*, 24 Cal. 3d 809, 169 Cal. Rptr. 691,
    620 P.2d 141 ..............................................................................................19

*Goldberg v State Farm*, 2002 WL. 768893 .............................................................17

*Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807 (1981)................................................20

*Hanke v. American Intern. South Insurance Co*, 335 Ill. App. 3d 1164, 1166, 1169-
    70 [782 N.E.2d 328, 332] ...........................................................................14, 15

*Jefferson Ins. Co. v. Sup. Ct.*, 3 C3d 398, 403 (1970) ..........................................13, 16

*Jordan v. Allstate Insurance*, 148 Cal. App. 4th 1062 (2007) ...................................20

*Kacha v. Allstate Insurance Co.*, 140 Cal. App. 4th 1023 (2006) ...............................13

*Medical Staff of Doctors Medical Center in Modesto v. Kamil*, 132 Cal. App. 4th 679
    (2005) .....................................................................................................12

*Rosenthal v Great Western Financial Securities Corporation*, 14 Cal. 4th 394 (1996)..11, 12, 22

*Safeco Insurance Co. of America v. Sharma*, 160 Cal. App. 3d 1060 (1984) ...................13

*Shepard v. Edward Mackay Enterprises, Inc.*, 148 Cal. App. 4th 1092 (2007) ................12

*Travis v. American Manufacturers Mutual Insurance Co.*, 335 Ill. App. 3d 1171,
    1176 [782 N.E.2d 322, 327] (2002) (emphasis added.)("*Travis*") .............................14, 15

BERDING & WEIL LLP
3240 Stone Valley Road West
Alamo, California 94507

Page

## FEDERAL STATUTES

9 U.S.C. §2 ................................................................................................12

10 CCR § 2695.8(b) .....................................................................................2

10 CCR § 2695.8(b)(2) .................................................................................7

10 CCR § 2695.8(c) ...............................................................................17, 18

10 CCR § 2695.8(b)(3) ...............................................................................18

C.C.P. § 1281.2 .........................................................................................18

California Unfair Competition Law, *Business and Professions Code* § 17200, et seq...................1

Fed.R.Civ.P 26(d) .....................................................................................22

Insurance Code § 790.03(h) ........................................................................13

Insurance Code § 2071 ..........................................................................15, 17

BERDING & WEIL LLP
3240 Stone Valley Road West
Alamo, California 94507

1          ## I.    INTRODUCTION

2          Plaintiff Arnesha Garner ("Plaintiff") commenced this class action against State Farm

3  Mutual Automobile Insurance Company ("State Farm") alleging that State Farm: (1) makes

4  settlement offers related to automobile total loss claims which it knows violate its policy and

5  California law; and (2) makes intentionally confusing and misleading statements to its

6  customers in order to conceal these violations.   The Complaint states causes of action for

7  breach of contract, breach of the covenant of good faith and fair dealing and violation the

8  California Unfair Competition Law, *Business and Professions Code* § 17200, et seq.  (the

9  "UCL")

10         Ignoring the substance of the Complaint, State Farm characterizes this action as a

11 simple dispute over the "actual cash value" of Plaintiff's vehicle and attempts to compel

12 Plaintiff to "resolve" the dispute by an appraisal of the vehicle.   It also seeks to stay this

13 litigation while this "dispute" is resolved.

14         This action is not a dispute over the "actual cash value" of Plaintiff's vehicle.

15         California regulatory law and State Farm's policy require that settlement offers made

16 to Plaintiff and the Class be based upon either asking price or the actual sales price of

17 comparable vehicles.   State Farm has resisted this requirement since at least 2002 and –

18 having failed to thwart it – now chooses to ignore it, claiming that the applicable California

19 regulation is not effective against State Farm.   As will be shown, the implausibility of this

20 claim is itself compelling evidence of State Farm's bad faith.

21         This action is a dispute over State Farm's practice of making illegal settlement offers,

22 its use of misleading and false statement to conceal the illegality of the offers from Plaintiff

23 and the Class and – most recently – its attempt to "cleanse" its illegal acts by invoking the

24 appraisal provisions of its policy.   Neither Plaintiff nor the Class agreed that such a dispute

25 could be "resolved" by appraisers.

26 / / /

27 / / /

28 / / /

## II.    STATEMENT OF FACTS

### A.    Industry Resistance To The Total Loss Regulation And The Filing Of Personal Insurance Federation v. Garamendi

The California Department of Insurance promulgates regulations governing the handling of automobile insurance claims.  Among these regulations is 10 CCR § 2695.8(b) (the "Total Loss Regulation"), which governs the handling of total loss claims    The Total Loss Regulation provides, in pertinent part:

(b) In evaluating automobile total loss claims the following standards shall apply:

(1) The insurer may elect a cash settlement that shall be based upon the actual cost of a "comparable automobile" less any deductible provided in the policy.

. . .

(2) "comparable automobile" is one of like kind and quality, made by the same manufacturer, of the same or newer model year, of the same model type, of a similar body type, with options and mileage similar to the insured vehicle. . . . *In determining the cost of a comparable automobile, the insurer may use either the asking price or actual sale price of that automobile.*

The italicized language implements a rule which the Department of Insurance first proposed in 2002.  In comments on the proposed regulation, State Farm objected to the requirement that the cost of a comparable automobile be determined by the asking price or actual sales price.  As summarized in the legislative history, State Farm's objection and the Department's response were as follows:

**Comment No.: 29**

**Section: 2695.8(b)(2)**

**Commentator:** Steve McManus, State Farm Insurance Companies

**Date of Comment:** May 9, 2002

**Type of Comment:** Written Document

**2. Requiring use of the asking price on non-sold cars** -This would eliminate the use of take prices, and artificially inflate the values. Requiring insurers to value total losses based upon asking price is requiring the overpayment of these claims.

**Response:** The Commissioner has considered the commentator's suggestion and rejects it.  This subsection does not require the use of asking price. It permits the use of actual sales prices of the vehicle, which is the most accurate

reflection of the market. Use of the ask-price would only be an issue if the insurer or his representative chooses not to use actual sales prices. *The purpose of the regulations is to preclude the use of a "take-price". The take-price methodology used by computerized automobile valuation companies results in unsupportable undervaluing of the vehicle.*     The take-price is used by these companies to represent what they contend is a more accurate reflection of the actual sell price of a particular vehicle. *The basic assumption here is that the "ask price" is negotiated down during the sales process. However, the CDI's investigation of consumer complaints and market conduct examinations shows that the take price of a comparable vehicle is based upon what the dealer would take in an all-cash purchase for that vehicle and is the lowest possible price a consumer could pay for that vehicle if he/she was a skilled negotiator. The standard for valuing an automobile for purposes of paying insurance claims should not be lowest possible price a consumer could pay for a car. The value should be based upon what an average consumer, with average negotiating skills, would pay.*

*Plaintiff's Request For Judicial Notice In Support Of Opposition To State Farm Mutual Automobile Insurance Company's Motion To Compel Contractual Appraisal And For A Stay Pending Appraisal, Ex. 5.*

In April 2003, language virtually identical to the italicized language was proposed by the Department of Insurance as part of an amendment to the Total Loss Regulation.   This amendment was challenged by the insurance industry in a lawsuit filed in July of that year (the "Total Loss Lawsuit").[1]

**B.     Settlement Of The Total Loss Lawsuit And The Availability Of DMV Sales Data**

As State Farm correctly asserts, in June of 2004, almost four years ago, the plaintiffs in the Total Loss Lawsuit and the Insurance Commissioner stipulated that the mandatory use of asking prices or actual sales prices be delayed until sixty (60) days "after sales price data becomes available from the Department of Motor Vehicles."[2]

---

[1] *State Farm Mutual Automobile Insurance Company's Notice Of Motion And Motion To Dismiss Plaintiff's Complaint For Failure To State A Claim [Fed.R.Civ.P. 12(b)(6)]; Memorandum Of Points And Authorities In Support Thereof* ("State Farm Dismissal Motion") at 4-5; *Defendants State Farm Mutual Automobile Insurance Company's Request For Judicial Notice In Support Of Motion to Dismiss Plaintiff's Complaint*, ("Request For Judicial Notice"), Ex. 2 (Complaint in *Personal Insurance Federation, et al. v. John Garamendi*) at 33 (Eighteenth Cause of Action) and  57 (proposed amendments attached as Exhibit 1 to the Complaint).

[2] State Farm asserts that it is a member of one of the organizations which filed the suit, the Personal Insurance Federation of California. *State Farm Dismissal Motion* at 5 n.1.

1    The Department of Motor Vehicles ("DMV") has made this data available since at

2  least 2004.   The relevant provisions of the Total Loss Regulation have therefore been

3  effective for four years.  The DMV states that another major vendor, CCC, has been receiving

4  this information since October 2004.  Apart from one aborted effort in 2006, Mitchell, who

5  provided State Farm's valuations, applied to the DMV for the first time in September 2007,

6  *after the settlement in this case occurred.*[3]

7    **C.    State Farm's Offer To Settle Plaintiff's Claim And Communications**
        **Related Thereto**

8

9    State Farm's auto insurance policy provides that:

10   The limit of our liability for loss to property or any part of it is the lower of:

11   1. the actual cash value; or

12   2.  the cost of repair or replacement. The cost of repair or replacement does not
        include any reduction in the value of the property after it has been repaired, as
        compared to its value before it was damaged.

13

14   Actual cash value is determined by the market value, age and condition at the
        time the loss occurred.

15  *Declaration of Thomas A. Bianco In Support of State Farm Mutual Automobile Insurance*

16  *Company's Motion To Compel Contractual Appraisal And For A Stay Pending Appraisal*

17  ("*Bianco Declaration*") at ¶13, Ex. A at 17 (page 29 of .pdf).

18    Plaintiff was involved in a collision in April of 2007.  After Plaintiff's vehicle car was

19  declared a total loss, on May 8, 2007, State Farm sent Plaintiff a settlement offer stating:

20  "The enclosed material from MITCHELL, an independent vehicle evaluation company, was

21  used to establish the settlement amount of your 2005 Ford Escape. " *Id.* at ¶14, Ex B, (page

22  36 of .pdf).  The "actual cash value" of the vehicle is stated to be $15,993.29.  *Id.*

23    Some time after May 8, 2007, Ms. Garner received this letter, which included the

24

25    [3] *Declaration Of David M. Birka-White In Support Of Plaintiff's Opposition To State*
26  *Farm Mutual Automobile Insurance Company's Motions To Dismiss Complaint And To*
    *Compel Contractual Appraisal And For A Stay Pending Appraisal*, Ex. 1.  As set forth in the
27  declaration, the DMV cannot currently provide a formal declaration relating to the facts stated
    in the letter so Plaintiff is producing the best information currently available.  Plaintiff is
28  continuing to work with the DMV and, if needed, can supply a declaration or other evidence
    in the future.

1   Mitchell valuation report (the "Valuation").    *Declaration Of Arnesha M. Garner In*

2   *Opposition To State Farm Mutual Automobile Insurance Company's Motion To Dismiss*

3   *Plaintiff's Complaint For Failure To State A Claim And Motion To Compel Contractual*

4   *Appraisal And For A Stay Pending Appraisal* ("*Garner Declaration*") at ¶8 and Ex A thereto.

5   Ms. Garner immediately believed that State Farm's valuation of her truck was low.  She

6   called Daphne Scales, the author of the letter, and advised her that she had reviewed the Kelly

7   Blue Book, which listed a higher value for her truck than that stated in the Valuation.  *Id.* at

8   ¶9. Ms. Scales told her that State Farm did not use Kelly Blue Book and that it looked at

9   similar vehicles in the area.  *Id.* at ¶10.

10       When Ms. Garner received the Valuation, she tried to understand how Mitchell

11   determined the value of her vehicle.  She found the report very complicated and impossible to

12   follow clearly.  She could not determine how Mitchell arrived at the value.  *Id.* at 13.  At the

13   time she reviewed the Valuation, she had no reason to believe that the Valuation was not

14   prepared in accordance with the law.  *Id.* at 14

15       **D.    The Mitchell Valuation**

16       The Valuation is not based on the asking or selling price of comparable vehicles and is

17   therefore not "an appropriate assessment of the actual cash value" of the vehicle.   The

18   Valuation is based on the "projected selling price" of comparable vehicles, a value generated

19   by Mitchell.  *Declaration Of Benjamin Sanchez, Jr. In Opposition To State Farm Mutual*

20   *Automobile Insurance Company's Motion To Dismiss Plaintiff's Complaint For Failure To*

21   *State A Claim And Motion To Compel Contractual Appraisal And For A Stay Pending*

22   *Appraisal* ("*Sanchez Declaration*"), ¶¶6-7 and Ex. A, at 10 (asterisked footnote).   Likewise

23   the statement that Mitchell is an "independent" valuation company is – at best – misleading.

24   Mitchell is employed by State Farm to do appraisals.[4]  Plaintiff believes that the evidence will

25   / / /

26

27       [4] In fact, State Farm bases its assertion that it did not have access to sales data
28   maintained by the Department exclusively upon alleged correspondence between the
     Department and Mitchell.  *State Farm Dismissal Motion* at 5-6.

1  demonstrate that Mitchell's use of a "projected selling price" was a major marketing tool for

2  Mitchell.

3      In each case, the projected selling price of the comparable vehicle used in the

4  Valuation is almost exactly 7.26% less than the asking price. *Sanchez Declaration*, ¶¶8-9 and

5  Ex. A at 5-8, 11-12. For example, Comparable 1 on page 11 of the Valuation shows a "list

6  price" $17,998. The base value of Comparable 1 used in estimating the value of loss vehicle

7  on page 5 of the Valuation, however, is $16,690, which is 7.27% less than $17,998. *Sanchez*

8  *Declaration*, ¶10 and Ex. A at 5. A summary of the differences in value between the list and

9  projected sales price follows:

| Comparable | List | Projected | Difference | Percent Reduction |
|---|---|---|---|---|
| 1 | $17,998 | $16,690 | $1,308 | 7.27 |
| 2 | $15,998 | $14,835 | $1,163 | 7.27 |
| 3 | $14,999 | $13,909 | $1,090 | 7.27 |
| 4 | $18,979 | $17,600 | $1,379 | 7.27 |
| 5 | $19,998 | $18,546 | $1,452 | 7.26 |
| 6 | $18,986 | $17,608 | $1,378 | 7.26 |
| 7 | $22,995 | $21,324 | $1,671 | 7.27 |
|  |  | Average |  |  |
|  | $18,564.71 | $17,216.00 | $1,349 | 7.26 |

*Sanchez Declaration*, ¶11.

The Valuation contains a mass of data in three tables and a set of footnotes spread over 13 pages. It does not explain how the information is used or how the various tables relate to each other. For example, the Valuation shows the list price of comparable vehicles buried in a mass of information many pages distant from the projected selling price. Even a professional appraiser would have a difficult time to follow or understand the formatting and content of the report. *Sanchez Declaration*, ¶12. The fact that the projected sales price is not a sales or asking price is not explained. *Sanchez Declaration*, ¶13.

The use by Mitchell of a projected sales price can be discovered only if the reader sees that the values on pages 5 through 8 of the Valuation are asterisked. The asterisk corresponds to a footnote, in very small type, which appears only once on page 10 of the Valuation. The second sentence of the footnote, which explains what a projected sales price is, is

1   incomprehensible. The footnote states: "For comparable vehicles that are available, the price

2   listed reflects a projected sales price. The projected sales prices for which the vehicle is

3   projected to sell for based on analyzing sold vehicle data for that specific year, make, model

4   vehicle. (sic)" *Sanchez Declaration*, ¶¶14-16.

5         There is no explanation of how the projected sales price relates to the list price – or

6   even that there is a list price for each vehicle. The fact that every projected sales price is

7   approximately 7.26% less than the list price suggests strongly that the projected sales price is

8   simply a percentage of the list price. *Sanchez Declaration*, ¶17.

9         The of use of a projected sales price for comparable vehicles results in a valuation of

10   Plaintiff's vehicle which is initially 7.26% less than the value calculated using the asking

11   price, as required by the Total Loss Regulation.

12         Mitchell also deducts from the value of a comparable vehicle an amount which

13   purportedly reflects a decline in value between the date on which the comparable vehicle was

14   advertised for sale and the date of the loss of the Loss Vehicle (the "Ad Age Adjustment"),

15   which results in a further deduction of $241 from the value of the comparable vehicle.

16   Plaintiff challenges both this adjustment and the explanation given for it. *Sanchez*

17   *Declaration*, ¶18. Because this adjustment is considerably smaller than the difference

18   between the asking price and the projected sales price, however, it is not explained at length

19   in this memorandum.[5]

20        **E.**    **The Appraisal Provision and Process**

21         The appraisal provision of the policy is accurately recited in State Farm's pleadings.

22

23

24      [5] Briefly, the use of the Ad Age Adjustment violates § 2695.8(b)(2) in that any adjustment to the price of the comparable vehicle used to value the Loss Vehicle must be

25   "discernible, measurable, itemized, and specified as well as appropriate in dollar amount . . . ." Deductions from the value of the comparable vehicle which do not meet these criteria "shall

26   not be used." The Ad Age Adjustment is not "discernible," "measurable" or "appropriate in dollar amount" within the meaning of the Total Loss Regulation. Moreover, the Total Loss

27   Regulation specifies that a comparable vehicle must be advertised within "ninety (90) calendar days of the final settlement offer." (§ 2695.8(b)(2) and (b)(4)). This requirement

28   accounts for the age of the advertisement. Further adjustment for the age of the advertisement is not permitted by the Total Loss Regulation.

1  *State Farm Mutual Automobile Insurance Company's Motion To Compel Contractual*

2  *Appraisal And For A Stay Pending Appraisal* (the "*State Farm Appraisal Motion*") at 3. The

3  appraisal provision applies only if "the owner and we cannot agree on the actual cash value"

4  of vehicle. In that case, each party selects and pays for an appraiser. The two party-appointed

5  appraisers select a third appraiser, whose cost is split. Compliance with the appraisal

6  provision could easily cost the insured $800-$1000. *Declaration Of Benjamin Sanchez, Jr. In*

7  *Opposition To State Farm Mutual Automobile Insurance Company's Motion To Dismiss*

8  *Plaintiff's Complaint For Failure To State A Claim And Motion To Compel Contractual*

9  *Appraisal And For A Stay Pending Appraisal* ("*Sanchez Declaration*"), ¶22 .

10      Prior to the filing of this litigation, Plaintiff was not provided with a copy of her

11  automobile insurance policy. *Garner Declaration*, ¶4. She was not aware of the existence of

12  the appraisal provision at any time before her accident. *Id.* at ¶5. She did not negotiate any

13  aspect of the appraisal process with State Farm; nor did any representative of State Farm

14  advise her about the meaning of the appraisal provision until after she received a letter dated

15  the May 8, 2007 from Daphne Scales of State Farm. *Id.* at ¶6.

16      During her conversation with Plaintiff about the value of her vehicle, Ms. Scales told

17  Plaintiff that she could hire her own appraiser if she disagreed with the valuation. Ms. Garner

18  asked her what the cost of an additional appraisal would be. Ms. Scales told her that it would

19  cost about $350 for her to hire an appraiser. Ms. Scales explained that State Farm had its own

20  appraiser and that Ms. Garner would have to pay one half the cost of a third appraiser as well.

21  Ms. Scales did not advise Ms. Garner of the names of any appraisers or tell her how to locate

22  one. *Id.* at ¶10

23      Ms Garner thought the $350 plus half the cost of another appraiser was more than she

24  could reasonably afford to challenge the State Farm valuation. She told Ms. Scales that the

25  cost of the appraisal was too much and that she did not believe that the process was fair. *Id.* at

26  ¶¶11-12. Ms Garner is employed by the United States Postal Service as a city carrier. In

27  May, 2007, she needed transportation to work and the rental car period under her policy only

28  lasted until May 14, 2007, a few days after she received the letter. *Id.* at ¶15.

*On the same date that it sent Ms. Garner the Valuation*, State Farm State Farm sent another letter to Plaintiff which stated:  "We have determined that your car is a total loss and have offered settlement. . . . We believe our offer represents an appropriate assessment of the actual cash value of your vehicle.  However, it appears that we are unable to conclude this claim based on our offer."  *Bianco Declaration* at ¶14, Ex. C (pages 39 -40 of .pdf )  After describing the appraisal provision, the letter states:  We hereby request [name missing] to be named as our appraiser."  *Id.*

### III.    SUMMARY OF ARGUMENT

1.    For the reasons stated below, the appraisal provisions of the policy are not enforceable against Plaintiff or the Class.  Even if they were, however:

    a.    Plaintiff asserts that State Farm intentionally offers to settle total loss claims by valuing "comparable vehicles" at less than "asking price or actual sale price" mandated by law and intentionally conceals this fact from its insureds by the use of incomprehensible and/or misleading language in the Valuations.  The appraisal provisions do not evidence an agreement to "appraise" claims of intentional misconduct and consumer fraud.   In two cases almost identical to that presented here, the Fifth District Appellate Court in Illinois refused to order an appraisal or stay the action.

    b.    Plaintiff's claims cannot be decided by appraisers because:

      i    Plaintiff's claims relating to the making and concealment of illegal settlement offers raise legal and factual issues which cannot be adjudicated by appraisers. *Jefferson Ins. Co. v. Sup.Ct.*, 3 C3d 398, 403 (1970) (Appraisers have "limited powers" and may not "resolve questions of coverage and interpret provisions of the policy.")

      ii    In order to arrive at an appraised value consistent with the law, all three appraisers would have to "decide" a key issue presented in this case, *i.e.*, whether the "actual cash value" of a vehicle can be calculated with reference to any price other than the "asking price or actual sale price" of comparable vehicles.  An appraiser is not competent to decide this issue. *Id.*

/ / /

1        c.      State Farm's reliance on *Community Assisting Recovery, Inc., v. Aegis*

2  *Security Insurance Company*, 92 Cal.App.4th 886 (2001)("*CAR*") is misplaced.  Among other

3  things:

4        i.      *CAR did not decide that the plaintiff's claims had to be submitted to*

5  *appraisal.*  The plaintiff in *CAR* alleged that the defendant insurers used the wrong valuation

6  method to adjust property loss claims.  *CAR* decided that the insurer was not required to adjust

7  claims based on the valuation method specified by the plaintiff or, in fact, on any particular

8  method.  Therefore, the insurer's adjustment of claims was neither "unlawful" nor "unfair"

9  and the plaintiff simply no claim at all.  Since the Court decided that the plaintiff had no

10  claim, *the court had no occasion to decide whether – if the plaintiff had a claim – it would*

11  *have been covered by the appraisal clause.*

12        The instant case is completely different.  The Total Loss Regulation requires that a

13  total loss claims be adjusted "based upon the actual cost of a 'comparable automobile'" and

14  that the value of a "comparable automobile" be calculated based on the "asking price or actual

15  sales price" of the vehicle.  State Farm's failure to adjust claims on this basis is "unlawful."

16  Misleading the insured concerning the actual content of its proposed valuation is both

17  "fraudulent" and "unfair."

18        ii.     *CAR* involved claims under a policy whose contents are mandated by

19  Insurance Code §2071.  This case involves a policy whose terms are not mandated by statute

20  and which has a *completely different* approach to adjusting claims than that mandated by §

21  2071.  As *CAR* makes clear, because of the way § 2071 addresses loss valuation, § 2071

22  appropriately limits disputes over value to an appraisal.  *CAR* does not hold or even suggest,

23  however, that every claim under every insurance policy which relates in any way to value

24  must decided by appraisers.

25        iii.    In *CAR*, the "complaint [did] not allege that [the insurer] . . . deceived .

26  . . the insureds to settle" for an incorrect amount or "that they engaged in any acts which

27  might have been a breach of the . . . policy."  Plaintiff in this case makes precisely these

28  allegations.

1        2.    An insurer forfeits the right to appraisal if it breaches the covenant of good faith

2    and fair dealing "by engaging in bad faith conduct designed to mislead the insured". *Chase v*

3    *Blue Cross*, 42 Cal.App.4th 1142, 1151-52, 1157-58 (1996). In this case, State Farm did not

4    offer Plaintiff the "right" to an appraisal because it actually wanted an appraisal. It used the

5    threat of an expensive appraisal process – together with its misrepresentations concerning the

6    appropriateness of the valuation and the "independence" of Mitchell – to dissuade Plaintiff

7    from challenging its value. This is bad faith conduct inconsistent with a desire to solve

8    genuine disputes by appraisal and should be held to be a forfeiture of the right to appraisal.

9        3.    The appraisal provision in the State Farm contract is unconscionable and

10    unenforceable. The provision is procedurally unconscionable in that it is not bargained for at

11    all but is simply part of a standard form policy. It is substantively unconscionable in that: (1)

12    an appraisal does not address the real problem with States Farm's settlement offer – the use of

13    an illegal values for comparable vehicles – something the insured could not possibly know;

14    (2) the cost of the appraisal to the insured represents a significant fraction of the amount by

15    which State Farm undervalues an individual car and thus it is economically irrational for the

16    insured even if the insured is right; (3) the threat of requiring an expensive appraisal is used

17    by State Farm to dissuade insureds from accepting their intentionally depressed offers; and (4)

18    the appraisal provision is used by State Farm to insulate itself from knowing violations of the

19    law in the unlikely event that the insured becomes of aware of the violation.

20        4.    Plaintiff believes that the Complaint in this case raises issues clearly outside the

21    scope of the appraisal provision and that the Court can decide this issue based on the

22    pleadings and the appraisal provision itself. If, however, the Court believes that there are

23    factual issues relevant to this motion which require further development, the motion to stay

24    should be denied without prejudice to its determination on an appropriate factual record after

25    any required discovery. *See Rosenthal v Great Western Financial Securities Corporation*, 14

26    Cal.4th 394, 412-13 (1996).

27    / / /

28    / / /

1

# IV.    ARGUMENT

2

## A.    THE FAA DOES NOT APPLY TO THIS CASE

3    The Federal Arbitration Act ("FAA") applies only to clauses in contracts "evidencing

4    a transaction involving commerce." 9 U.S.C. §2.  The burden of proving that the FAA applies

5    is on the party asserting the claim.  *E.g., Shepard v. Edward Mackay Enterprises, Inc.*, 148

6    Cal.App.4th 1092, 1101 (2007).

7    This case involves a California plaintiff asserting claims on behalf of a California-only

8    class asserting a claim arising under contracts entered into in California and stating claims

9    which arise solely under California law.  State Farm has provided the Court with no reason to

10    believe that the FAA applies to this case.[6]

11    ## B.    Even Were the Appraisal Provision of the Policy Enforceable against Plaintiff and the Class it Would Not Apply to the Claims Asserted Herein

12

13    The question of whether parties to a contract agreed to arbitrate a particular question is

14    decided based on ordinary state law contract law principles.  *Efund Capital Partners v. Pless*,

15    150 Cal.App.4th 1311, 1321 (2007); *First Options of Chicago, Inc. v. Kaplan* 514 US 938,

16    944 (1995).  And while California law favors arbitration agreements, "[t]here is no public

17    policy requiring persons to arbitrate disputes they have not agreed to arbitrate."  *Id.* at 1320;

18    *Bono v. David*, 147 Cal.App.4th 1055, 1063 (2007); *Medical Staff of Doctors Medical Center*

19    *in Modesto v. Kamil,* 132 Cal.App.4th 679, 684 (2005).

20    ## C.    The State Farm Appraisal Provision Does Not Cover This Dispute

21    **a.**    The State Farm Appraisal Provision Does Not Cover This Dispute

22    The appraisal provision in the State Farm policy is triggered only if "the owner and we

23    cannot agree on the actual cash value."  This provision contemplates a good faith dispute

24

25

26    [6] Because Plaintiff does not believe that the result would be different under the FAA, Plaintiff will not address this issue further.  The California Supreme Court has noted the very

27    similar principles and common origin of the FAA and the California Act.  *Rosenthal v Great Western Financial Securities Corporation, supra,* 14 Cal.4th at 406 n.3 ("In most important

28    respects, the California statutory scheme on enforcement of private arbitration agreements is similar to the USAA").

1    between experts about how to apply an agreed-upon legal standard of value, an issue which

2    can be addressed by appraisers.  That is not the problem posed by this case.  The Complaint

3    alleges that:

> State Farm employed Mitchell to perform total loss valuations with full knowledge that Mitchell would not value such claims appropriately, but would instead return valuations that were improperly reduced as previously alleged. State Farm knew and intended that by employing Mitchell valuations State Farm would breach its contractual duties to its policyholders, as well as the covenant of good faith and fair dealing, and that State Farm would be in violation of Insurance Code § 790.03(h) and the Total Loss Regulation. The intentional wrongdoing of State Farm was carried out for the purpose of paying its policyholders less than the full value of their total loss claims through the use of improper adjustments.

• • •

> State Farm presented the Valuation to Plaintiff and the Class members as accurate and fair when, in actuality, State Farm knew the Valuations to be inaccurate, unfair and not in compliance with the Total Loss Regulation. State Farm used the Mitchell Valuation for the purpose of deceiving Plaintiff and members of the Class members into accepting less than the full value to which they were entitled in settlement of their claims

14    *Complaint*, ¶¶ 45 and 47.

15        These issues are not "appraisable."  Even if an appraisal provision is treated in some

16    sense as an agreement to arbitrate, there is a crucial difference between appraisal and

17    arbitration.  Appraisers may not determine questions of law, such as coverage questions, or

18    interpret policy provisions.  *Jefferson Ins. Co. v. Sup. Ct.*, 3 C3d 398, 403 (1970); *Kacha v.*

19    *Allstate Ins. Co.*, 140 Cal.App.4th 1023, 1026 (2006); *Safeco Ins. Co. of America v. Sharma*,

20    160 Cal.App.3d 1060, 1063 (1984).

21        An appraiser could not even decide whether or not "actual cash value" must be based

22    upon asking or selling price, since this question is a question of law.  For example, in

23    *Jefferson Ins. Co. v. Sup.Ct.*, the California Supreme Court vacated an appraisal because the

24    appraisers used the wrong standard to determine the "actual cash value" of an insured

25    property loss. *Jefferson Ins. Co. v. Sup.Ct.*, *supra*, 3 C3d at 403.

26        Much less could an appraiser determine whether State Farm's claim valuation violates

27    the law or its efforts to conceal this violation from its insureds are a breach of the covenant of

28    good faith and fair dealing.  Nor would the appraiser have right to decide whether State

1    Farm's conduct violates the UCL, whether State Farm's disclosure concerning the valuation

2    complies with the Total Loss Regulation or any number of other issues.

3         In a case virtually identical to this case, the Illinois Court of Appeals denied a petition

4    to compel appraisal because the dispute was outside the scope of the appraisal clause.  The

5    Court described the claims asserted in that case as follows:

> 6    Plaintiff accuses defendant of engaging in a fraudulent scheme that included
>     defendant contracting with third-party vendors to provide defendant with
> 7    biased, below-market estimates of total-loss-vehicle values. . . . *Plaintiff claims
>     that defendant used these estimates, which were arrived at by using valuation
> 8    reports generated by a computer software program that systematically
>     undervalued the actual cash value of total-loss vehicles, to defraud its insureds
> 9    in connection with the insureds' claims for the total loss of their vehicles.*
>     Plaintiff charges defendant with intentionally reducing its overall total-loss
> 10   claims payouts at the expense of its insureds by using these biased reports,
>     which at first blush appear independent and unbiased. *According to plaintiff,*
> 11   *defendant relies on these reports to demonstrate the purported
>     "reasonableness" of what it determines to be the actual cash value of the*
> 12   *totaled vehicle so that the insureds either will not challenge the valuation
>     amount or will settle for an amount greater than the valuation but less than the*
> 13   *actual cash value of the vehicle.* Plaintiff further alleges that a part of the
>     fraudulent scheme includes a policy provision which requires the parties to
> 14   submit to an appraisal if requested by either the insured or the insurer.

15   *Travis v. American Mfrs. Mut. Ins. Co.*, 335 Ill.App.3d 1171, 1177 [782 N.E.2d 322, 327]

16   (2002) (emphasis added.)("*Travis*").  The court held:

> 17   The parties disagree on whether their dispute involves "the amount of loss"
>     and whether it falls within the scope of the appraisal provision. *We conclude,*
> 18   *as did the trial court, that plaintiff's complaint raises much more than a
>     dispute over the actual cash value of her vehicle, that is, the amount of loss,*
> 19   *and that the issues raised by the complaint do not fall within the scope of the
>     appraisal clause and could not, in any event, be resolved through the appraisal*
> 20   *process.*

21   *Id.* at 1176 [782 N.E.2d at 326](emphasis added).  In a virtually identical case, *Hanke v.*

22   *American Intern. South Ins. Co*, 335 Ill.App.3d 1164, 1168-69 [782 N.E.2d 328, 332]

23   ("*Hanke*"), the court reached the same result. [7]

24

25   ——————————————

26     [7] The only difference between *Hanke*, on one hand, and this case and *Travis*, on the
     other, is that the second amended complaint in *Hanke* specifically alleged that the appraisal
27   remedy was used to further the fraud.  Plaintiff makes the same argument in connection with
     this motion and, given State Farm's current motion, is likely to amend the Complaint to allege
28   the misuse of the appraisal process as part of its claims under the UCL and for breach of the
     covenant of good faith and fair dealing.

1    The appraisal provisions in *Travis* and *Hanke* were essentially identical to that

2  involved in this case. *Travis, supra*, 335 Ill.App.3d at 1176 [782 N.E.2d at 326]; *Hanke*,

3  *supra*, 335 Ill.App.3d at 1166 [782 N.E.2d at 330]. Like California and federal law, Illinois

4  has a strong public policy favoring informal dispute resolution. *Hanke, supra*, 335 Ill. App. at

5  1169-70 [782 N.E.2d at 332-33]. Nonetheless, the court in *Hanke* held that the dispute was

6  outside the scope of the appraisal provision because "the instant case presents much more

7  than a disagreement between the parties concerning the actual cash value of plaintiff's truck."

8  *Id.* at 1169 [782 N.E.2d at 332-33].

9
          ### 1.    State Farm's Reliance On *CAR* Is Misplaced.
10

11    State Farm's reliance on *Community Assisting Recovery, Inc., v. Aegis Security*

12  *Insurance Company*, 92 Cal.App.4th 886 (2001)("*CAR*") is misplaced. State Farm argues that

13  the court in *CAR* "dismissed a Business & Professions Code section 17200 lawsuit brought by

14  a non-profit corporation against 194 insurers alleging undervaluation of property loss claims,

15  in part because such disputes were subject to binding appraisal pursuant to the provisions of

16  the policies." *State Farm Appraisal Motion* at 8. This assertion is plainly false.

17    The court in *CAR did not decide that the plaintiff's claims were subject to appraisal or

18  dismiss the claim because plaintiff failed to follow the appraisal provision of the policy*. The

19  plaintiff in *CAR*, like the Plaintiff here, alleged that the insurers adjusted property loss claims

20  using the wrong standard. The court in *CAR* held that, under the statutorily-mandated terms of

21  the policy in that case, the insurer could adjust claims using the standard challenged by the

22  plaintiff (or any other) and *thus the plaintiff had no claim at all*. The court had no occasion to

23  consider whether, *if plaintiff had a claim*, the claim *would have been* subject to appraisal.

24    *CAR* involved a form of insurance policy mandated by Insurance Code § 2071.[8] The

25  ────────────────

26    [8] Insurance Code § 2070 provides, in pertinent part: "All fire policies on subject
    matter in California shall be on the standard form, and, except as provided by this article shall
27  not contain additions thereto. No part of the standard form shall be omitted therefrom except
    that any policy providing coverage against the peril of fire only, or in combination with
28  coverage against other perils . . . .." Insurance Code § 2071 specifies the standard form of the
    policy.

1  plaintiff in *CAR* filed a class action challenging the practice of "adjusting property loss claims

2  on the basis of replacement cost less depreciation rather than on the basis of fair market value,

3  in violation of the mandates set forth in [*Jefferson Ins. Co. v. Sup.Ct., supra*, also a case

4  interpreting a § 2071 policy]." *CAR, supra*, 92 Cal.App.4th at 891.   The trial court sustained

5  the defendants' demurrer without leave to amend and the Court of Appeal affirmed.

6       Under the policy mandated by § 2071, "the insured carries the initial responsibility to

7  determine the 'actual cash value,' or the fair market value of the property at the time of the

8  loss." *Id.* at 893-94.   The court held that the insurer then has the right to counter that value

9  with a value based on replacement cost less depreciation (or some other method) and that any

10 remaining disagreement over the value, no matter how calculated, has to be addressed in the

11 manner specified by the Legislature:

12        The Legislature has provided more than one measure to adjust claims under
          section 2071, "actual cash value" being only one. It is the initial responsibility
13        of the insured to identify the "actual cash value" of the property damaged and,
          if the insured disagrees with a value suggested by the carrier, the appraisal
14        process provides the means by which the dispute is to be settled. In light of the
          scheme provided by section 2071, plaintiff has failed to demonstrate an
15        unlawful or unfair practice.

16 *Id.* at 895.

17       The plaintiff's entire case was premised on the assertion that *Jefferson* prohibits the

18 adjustment of claims based on replacement value less depreciation. The *CAR* court held that

19 the Supreme Court in *Jefferson* did not "suggest that insurers in the future would be guilty of

20 unlawful acts by adjusting the claim for some amount other than fair market value,

21 replacement cost, or cost of repair" and that it therefore could not "conclude that a practice by

22 one or more carriers of using the 'replacement cost less depreciation' valuation is an 'unfair

23 practice.'" *Id.* at 894.

24       By contrast, *its is unlawful for State Farm to adjust a total loss claim based on

25 something other than the asking price or actual sales price of comparable vehicles*.   And it is

26 unfair, unlawful and fraudulent to represent that the value is lawful and intentionally to

27 obscure how the value was calculated.   Nothing in *CAR* suggests that such a dispute would

28 have been resolvable by appraisers.

Further, because an insurer who issues a policy governed by § 2071 is free to make loss valuation proposals using any recognized method, appraisals under § 2071 policies will *always* be a dispute limited to value, an issue the appraisers can resolve. It will *never*, as in this case, involve a question of whether the adjustment method itself was consistent with the insurer's legal obligations. Thus, the *CAR* court's statements about appraisal make sense in the context of a § 2071 policy. There is, however, nothing in *CAR* even to suggest that bad faith or consumer fraud claims under a different policy are subject to whatever appraisal provisions may exist in that policy.

Finally, the *CAR* court noted that the "complaint does not allege that [the insurer] . . . deceived . . . the insureds to settle" for an incorrect amount or "that they engaged in any acts which might have been a breach of the . . . policy." The Complaint in this case makes precisely these allegations. *E.g., Complaint*, ¶¶ 45 and 47.[9]

### 2.    Nothing In The Total Loss Regulation Supports State Farm

State Farm argues that:

> In promulgating Fair Claim Settlement Practices regulation 2695(c) (sic), the California Department of Insurance has likewise sanctioned appraisal as a remedy for a dispute regarding the valuation of a total loss claim. Section 2695(c) (sic) permits an insurer to "invoke the appraisal provision of the insurance policy" in the event of a disagreement over its valuation of an insured's total loss automobile claim.

*State Farm Appraisal Motion* at 9.

The provision referred to by State Farm is § 2965.8 (c), which requires an insurer to reopen its claim file "if notified by the insured within thirty-five (35) calendar days after the insured receives the claim payment or final settlement offer that he or she cannot purchase a comparable automobile for the gross settlement amount." If this occurs, the insurer can locate

---

[9] State Farm's reliance on the unreported District Court decision in *Goldberg v State Farm*, 2002 WL 768893, is likewise misplaced. Citing *CAR*, the court in *Goldberg* dismissed a case premised on State Farm's alleged failure to pay "actual cash value" on claims governed by Insurance Code § 2071. The Court held: "Because Plaintiff's Policy is governed by Section 2071, State Farm argues that the recent *CAR* decision disposes of Plaintiff's lawsuit. Def.'s Mot. To Dismiss at 10. The Court agrees." *Id.* at *2. For the reasons stated above, this case is not governed by § 2071 or affected by the decision in *CAR*.

a comparable or replacement vehicle (§ 2965.8(c)(1)), pay the insured the difference between the value of a car found by the insured and the amount offered by the insurer (§ 2965.8(c)(2)) or invoke the appraisal provisions of the policy (§ 2965.8(c)(3)).

First, the appraisal option specified in § 2965.8(c) is not mandatory. It is one of only three options given to the insurer. Second, the situation described in § 2965.8 (c) did not occur in this case and there is no evidence that State Farm gave the required notice. Third, Plaintiff does not argue that appraisal provisions are invalid *per se* so the fact that they might be used in appropriate circumstances is irrelevant to the issues presented here.

**D.      Even If the Appraisal Provision Covered the Dispute in This Case, It Would Not Be Enforceable Against Plaintiff Or The Class**

**1.      State Law Governs Defenses To Appraisal Provisions**

Even if the Court determines that this case is governed by the FAA, state law governs defenses to the enforcement of an appraisal provision. *First Options of Chicago, Inc. v. Kaplan*, *supra*, 514 U.S. at 944; *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892-93 (9th Cir.2002).

**2.      State Farm Is Precluded From Enforcing The Appraisal Provision Because Of Its Breach of the Covenant of Good Faith and Fair Dealing**

CCP § 1281.2 provides, in pertinent part:

> On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that:
>
> (a) The right to compel arbitration has been waived by the petitioner . . .

*CCP § 1281.2*. Although "waiver" requires the intentional relinquishment of the right to arbitrate, a court may deny an insurer the right to arbitrate even if the insurer did not intend to waive the right. An insurer who violates the covenant of good faith and fair dealing by engaging in bad faith conduct designed to mislead the insured may "forfeit" the right to compel arbitration of a dispute. *Chase v Blue Cross*, *supra*, 42 Cal.App.4th at1151-52, 1157-58.

1    In *Chase*, the court described the covenant of good faith and fair dealing as follows:

2    A covenant of good faith and fair dealing is implied in every contract. (Rest.2d
     Contracts, § 205, p. 99.) The scope of that covenant varies from case to case
3    depending upon the contractual purposes. In the context of insurance contracts,
     the covenant requires the insurer to "give at least as much consideration to the
4    welfare of its insured as it gives to its own interests." ( Egan v. Mutual of
     Omaha Ins. Co. (1979) 24 Cal.3d 809, 818, 169 Cal.Rptr. 691, 620 P.2d 141.)
5    Part of this requirement is "the duty reasonably to inform an insured of the
     insured's rights and obligations under the insurance policy." [Citation omitted.]
6
7    *Id.* at 1151-52.  The Court further held:

8    In order to find a forfeiture by the insurer of the right to arbitration, we
     understand *Davis* and *Sarchett* to require conduct designed to mislead
9    policyholders. Such a requirement balances the enhanced duty of the insurer as
     a contracting party against the strong public policy in favor of arbitration.
10   Furthermore, the court's focus when evaluating an allegation of forfeiture
     should be on the subjective intent of the insurer. Such focus is consistent with a
11   finding of bad faith and the imposition of a penalty in the form of forfeiture.

12                                        • • •

13   Consequently, even if the insured is aware of the arbitration right, bad faith
     tactics designed to mislead the insured merit the sanction of forfeiture.

14   *Id.* at 1157.

15       Typically, the misrepresentations of the insurer mislead the insured regarding the

16   existence of the right to arbitrate.  See *Chase v Blue Cross, supra,* 42 Cal.App.4th at1155-56.

17   However, there is nothing in *Chase* which requires that the insurer's misrepresentations must

18   always go to the existence of the right.  As noted in *Chase,* the "scope of that covenant varies

19   from case to case depending upon the contractual purposes" and that "[i]n the context of

20   insurance contracts, the covenant requires the insurer to 'give at least as much consideration

21   to the welfare of its insured as it gives to its own interests.'"  *Id.* at 1151-52.

22       In this case, State Farm did not offer Plaintiff the "right" to an appraisal because it

23   actually wanted an appraisal.  Advising Plaintiff that she had the choice to challenge State

24   Farm's illegally-calculated value by an appraisal which would cost half the amount in

25   controversy was not the offer of a cheap informal remedy – the legitimate purpose of an

26   appraisal – but rather a device to dissuade her from contesting a value it knew was improperly

27   calculated.  And in the attempt to dissuade Plaintiff from challenging its valuation, State Farm

28   falsely represented the offer was an "appropriate" measure of "actual cash value" prepared by

1    an "independent appraiser."[10]

2        Further, State Farm's attempt to use the appraisal provision to deny Plaintiff the right

3    to be heard on these claims is further evidence that it did not intend that the appraisal

4    provision fill its actual purpose.  Under the circumstances, State Farm did not give Plaintiff's

5    welfare as much consideration as its own and its bad faith misrepresentations are inconsistent

6    with a genuine desire to invoke the appraisal provision in good faith.

7            **3.    The Appraisal Provision Is Unconscionable**

8        A court may refuse enforcement of an agreement to arbitrate if the arbitration clause is

9    unconscionable.    E.g., *Graham v. Scissor-Tail, Inc.*, 28 Cal.3d 807, 819-828 (1981)

10   (Arbitration provision requiring arbitration before one party to dispute).  Determining whether

11   a contract provision is unconscionable is a two-step process.  The contract is "procedurally"

12   unconscionable if it is imposed by one party on the other with no chance for actual

13   bargaining.  It is substantively unconscionable if the provision in question operates harshly or

14   unfairly against the weaker party.  *Discover Bank v. Superior Court* (2005) 36 Cal.4th 148,

15   159-60; *Ingle v. Circuit City Stores, Inc.* 328 F.3d 1165 (9th Cir. 2003).

16       In this case, the procedural element of unconscionability is easily met.  Standard form

17   policies provided on a "take it or leave it" basis are commonly held to be procedurally

18   unconscionable.  E.g., *Ingle v. Circuit City Stores, Inc.*, *supra*, 328 F.3d at 1171.  ("Circuit

19   City, which possesses considerably more bargaining power than nearly all of its employees or

20   applicants, drafted the contract and uses it as its standard arbitration agreement for all of its

21   new employees. The agreement is a prerequisite to employment, and job applicants are not

22   permitted to modify the agreement's terms-they must take the contract or leave it.")

23   / / /

24

25

26       [10] State Farm's violation of the Total Loss Regulation is evidence of its breach of the
     covenant of good faith and fair dealing. *Jordan v. Allstate Insurance*, 148 Cal.App.4th 1062,
27   1077-78 (2007).  Its intent to mislead should be inferred from its obvious awareness of the
     requirement that losses be determined by asking prices or actual sales, its plain violation of
28   the Total Loss Regulation in using the "projected sales price" and the flimsiness of its alleged
     excuse for doing so, i.e., the alleged unavailability of DMV data..

1    The policy is a standard form automobile policy.  *State Farm Appraisal Motion* at 2

2    (The policy at issue was the same as "every policy issued by State Farm in California during

3    the limitations period.")  *Bianco Declaration*, Ex. A.  Plaintiff did not even see her policy;

4    much less did she negotiate over its contents.  State Farm, as a major insurer, clearly has more

5    bargaining power than any single driver.  Nor does State Farm suggest that anyone is given

6    the right to negotiate over or modify their standard contract.

7    The substantive prong of the unconscionability test is likewise easily met here.  The

8    appraisal provision in this case works strongly against the weaker party.  When Ms. Garner

9    called State Farm to protest the valuation of her vehicle because, *inter alia*, the Kelley Blue

10   Book price was higher she was told and that in order to contest the claim she would have to

11   hire an appraiser.  When she protested that she was paying to get a fair valuation from State

12   Farm and could not afford to hire an appraiser, she was told that the appraisal remedy was

13   "just the way it works."  She believed that the valuation was unfair, but did not have the funds

14   to contest it and believed that she had no other choice than to accept the valuation.

15   The harshness of the result imposed on Ms. Garner is even more severe when

16   considered in light of the facts that Ms. Garner was not told and did not know, *i.e.*, that (1) the

17   value given to her by State Farm was not calculated in the manner required by law, a fact

18   which State Farm knew; (2) an appraisal would not address the real problem with States

19   Farm's settlement offer – the use of an illegal values for comparable vehicles; (3) the actual

20   cost of the appraisal process to the Ms. Garner would about half the amount by which State

21   Farm undervalued her car and thus would have been economically irrational for Ms. Garner

22   even if she was right; (4) the threat of requiring an expensive appraisal is used by State Farm

23   to dissuade insureds from accepting their intentionally depressed offers; and (5) the appraisal

24   provision is used by State Farm to insulate itself from knowing violations of the law in the

25   unlikely event that its insureds become aware of the violation.

26   The appraisal provision thus works very harshly against the weaker party in this case

27   and should not be enforced.

28

1    **E.    If The Court Believes That There are Factual Issues Which Must Be Resolved In Order to Address The Issues Raised In This Motion, An Evidentiary Hearing Should Be Held To Resolve Them.**

3    A motion to compel arbitration will often occur early in a case, before any discovery

4   has occurred or – under Fed.R.Civ.P. 26(d)[11] – before any discovery could occur.  And in

5   some cases, resolution of a motion to compel arbitration might require proof of the intention

6   of a party and involve sharply conflicting factual contentions.   Even though the California

7   Arbitration Act generally requires that such issues be addressed by motions, the California

8   Supreme Court has held that case with considerable factual disputes should be addressed in an

9   evidentiary hearing.  In such cases, the California Supreme Court has held that:

> We consider next the means to be used by the trial court in finding the facts relevant to enforcement of the arbitration agreement.  As both parties acknowledge, hearing and determination "in the manner ... provided by law for the ... hearing of motions" (§ 1290.2) would ordinarily mean the facts are to be proven by affidavit or declaration and documentary evidence, with oral testimony taken only in the court's discretion.
>
> • • •
>
> [W]e agree that where-as is common with allegations of fraud such as are made here-the enforceability of an arbitration clause may depend upon which of two sharply conflicting factual accounts is to be believed, the better course would normally be for the trial court to hear oral testimony and allow the parties the opportunity for cross-examination.

*Rosenthal v Great Western Financial Securities Corporation*, *supra*, 14 Cal.4th 394, 413-14 (1996).

Similarly, in appropriate cases, it might be necessary to allow some discovery to occur before a hearing on a motion to compel arbitration is heard.  *Id*. (finding no showing that discovery was required in that case.

If this case is governed by the FAA, then § 4 of the FAA provides:

> If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. *Where such an issue is raised, the party alleged to be in*

---

[11]  Fed.R.Civ.P 26(d) prohibits discovery "from any source before the parties have conferred as required by Rule 26(f)," an event which generally does not take place before an answer or motion to dismiss is due.

*default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.*

Plaintiff in this case has demanded a jury in the case generally and demands a jury trial on disputed factual issues within the scope of FAA § 4.

Plaintiff believes that the Court can determine the scope of the appraisal clause in this case without detailed consideration of disputed facts and that the issues relating to the scope of the provision are largely a matter of law. The appraisal provision is fairly straightforward and the Court can determine whether the claims made in this case are within its scope. Because Plaintiff believes that the claims in the case are excluded from the appraisal provision under applicable law, Plaintiff does not believe that an evidentiary hearing of any kind is required in order to decide the motion.

If, however, the Court believes that it is necessary to go beyond a comparison of the language of the policy provision and the allegations of the Complaint in order to determine whether the appraisal provisions apply to this case (such as, for example, if the Court believes that evidence of State Farm's knowledge of its violation of the law or its intent in demanding arbitration are relevant), then Plaintiff would request the right to conduct limited discovery and have an evidentiary hearing to address the issues.[12]

Because Plaintiff does not currently know what issues the Court believes need to be resolved in order to decide this motion, Plaintiff requests that, if the Court intends to

---

[12] Plaintiff has developed the best evidence it can at this early stage of the litigation. However, some evidence which clearly can be improved upon – such as the testimony of appropriate DMV personnel or other valuation companies concerning the availability of vehicles sales data – might require a subpoena. And some evidence, like direct evidence of State Farm's intentions with respect to the lawfulness of its valuation and its use of the appraisal remedy to avoid contests over its valuations could only be developed after some discovery.

1  have a further hearing, Plaintiff and State Farm be given the opportunity to address the

2  questions of discovery and a trial at a status conference or through some other vehicle which

3  the Court deems appropriate.

**V.    CONCLUSION**

5       For the reasons stated herein, Plaintiff respectfully requests that State Farm's motion

6  to compel appraisal and to stay these proceedings be denied in its entirety.

7  Dated:   April 30, 2008               BIRKA-WHITE LAW OFFICES

9                    By:_____/S/_____
                          Stephen Oroza

10

11                    David M. Birka-White (State Bar No. 85721)
                  Stephen Oroza (State Bar No. 84681)

12                    Thomas D. Hicks (State Bar No. 238545)
                  BIRKA-WHITE LAW OFFICES

13                    744 Montgomery Street, Fourth Floor
                  San Francisco, Califorornia 94111

14                    Telephone:  (415) 616-9999
                  Facsimile:  (415) 616-9494

15                   _____/S/_____

16                    Jeffrey B. Cereghino (State Bar No. 99480)
                  BERDING & WEIL LLP

17                    3240 Stone Valley Road West
                  Alamo, California 94507

18                    Telephone:  (925) 838-2090
                  Facsimile:  (925) 820-5592

19                    Counsel for Plaintiff Arnesha Garner

20

21

22

23

24

25

26

27

28