**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARNESHA M. GARNER, | No. C 08-1365 CW |
| Plaintiff, | ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S CROSS-MOTION FOR SUMMARY ADJUDICATION |
| v. | |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, | |
| Defendant. | |
| _____/ | |

     This is a putative class action in which Plaintiff Arnesha
Garner charges Defendant State Farm Mutual Automobile Insurance
Company with failing to comply with California's Total Loss
Regulation (TLR) when it values its policyholders' vehicles after a
total loss.  Defendant moves for summary judgment on the ground
that it was not required to comply with the relevant portion of the
TLR at the time it settled Plaintiff's claim.  Plaintiff opposes
Defendant's motion and cross-moves for summary adjudication on the
same issue.  The matter was heard on January 22, 2009.  Having
considered oral argument and all of the papers submitted by the
parties, the Court holds that Defendant was required to comply with
the TLR.  It therefore denies Defendant's motion and grants

1   Plaintiff's cross-motion.

2                              BACKGROUND

3   I.   Overview of the Action

4        Plaintiff holds an automobile insurance policy issued by

5   Defendant.  On April 27, 2007, Plaintiff was involved in an

6   accident that resulted in the total loss of her vehicle.  She

7   submitted a claim with Defendant.  Based on an analysis performed

8   by Mitchell International, Inc., Defendant valued Plaintiff's car

9   at $15,993 and offered to settle her claim accordingly.

10       Plaintiff asserts that Defendant undervalued her car because

11  the valuation method on which Mitchell relied violates the Total

12  Loss Regulation (TLR) promulgated by the California Department of

13  Insurance (CDI) in 2003.  This regulation provides in relevant part

14  as follows:

15       (b) In evaluating automobile total loss claims the
         following standards shall apply:
16
             (1) The insurer may elect a cash settlement that
17           shall be based upon the actual cost of a "comparable
             automobile" less any deductible provided in the
18           policy. . . .

19           (2) A "comparable automobile" is one of like kind
             and quality, made by the same manufacturer, of the
20           same or newer model year, of the same model type, of
             a similar body type, with options and mileage
21           similar to the insured vehicle. . . . In determining
             the cost of a comparable automobile, the insurer may
22           use either the asking price or actual sale price of
             that automobile.  Any differences between the
23           comparable automobile and the insured vehicle shall
             be permitted only if the insurer fairly adjusts for
24           such differences.  Any adjustments from the cost of
             a comparable automobile must be discernible,
25           measurable, itemized, and specified as well as
             appropriate in dollar amount and so documented in
26           the claim file.  Deductions taken from the cost of a
             comparable automobile that cannot be supported shall
27           not be used. . . . A comparable automobile must have
             been available for retail purchase by the general
28           public in the local market area within ninety (90)

                                    2

1   <u>calendar days of the final settlement offer</u>. . . .

2   . . .

3   (4) The insurer shall take reasonable steps to verify that the determination of the cost of a comparable vehicle is accurate and representative of the market value of a comparable automobile in the local market area. . . . <u>The cost of a comparable automobile shall be determined as follows and, once determined, shall be fully itemized and explained in writing for the claimant at the time the settlement offer is made</u>:

8   (A) when comparable automobiles are available or were available in the local market area in the last 90 days, the average cost of two or more such comparable automobiles; or,

11  (B) when comparable automobiles are not available or were not available in the local market area in the last 90 days, the average of two or more quotations from two or more licensed dealers in the local market area; or,

14  (C) the cost of a comparable automobile as determined by a computerized automobile valuation service that produces statistically valid fair market values within the local market area; or

17  (D) if it is not possible to determine the cost of a comparable automobile by using one of the methods described in subsections (b)(3)(A), (b)(3)(B) and (b)(3)(C) of this section, the cost of a comparable automobile shall otherwise be supported by documentation and fully explained to the claimant.  Any adjustments to the cost of a comparable automobile shall be discernible, measurable, itemized, and specified as well as appropriate in dollar amount and so documented in the claims file. Deductions taken from the cost of a comparable automobile that cannot be supported shall not be used[.]

24  10 Cal. Code Regs. § 2695.8(b) (emphasis added).

25  The complaint alleges three ways in which Defendant has

26  violated the TLR.  First, Defendant determines the value of

27  comparable vehicles by using what it calls a "projected sales

28  price."  This figure, which Mitchell provides to Defendant, is

3

United States District Court
For the Northern District of California

derived by using a computer model to reduce the advertised price of the comparable vehicle by a particular amount -- in the case of Plaintiff's claim, 7.26% -- to reflect the price at which the vehicle is likely to sell.  Plaintiff claims that Defendant's reliance on the projected sales price violates the TLR because this price is neither the "asking price or actual sale price."  See § 2695.8(b)(2).  She also claims that using the projected sales price results in the systematic undervaluation of total losses.

Second, Defendant allegedly deducts from the value of comparable automobiles an amount that reflects the decline in the vehicles' value between the date on which they are advertised for sale and the date of the total loss.  Plaintiff claims that this amounts to an adjustment that is not "discernible, measurable, itemized, and specified as well as appropriate in dollar amount" as required by § 2695.8(b)(2).  Plaintiff asserts that no ad-age adjustment is permitted because the TLR already takes into account the age of the advertisement.  It requires that, in order for an automobile to serve as a comparable vehicle, it must have been advertised within ninety days of the final settlement offer.

Third, Defendant allegedly fails to explain fully how it calculates the value of total losses.  Plaintiff claims that the information Defendant provides with its settlement offers is intentionally arcane and obscure, and is intended to disguise its use of improper valuation methods.

Plaintiff alleges that, as a result of Defendant's use of a "projected sales price" and its ad-age adjustment, she was offered $1,564 less for her vehicle than it was worth, based on a valuation

4

United States District Court
For the Northern District of California

method permitted under the TLR.[1]  She now charges Defendant with breaching the insurance policy, of which she maintains the TLA forms a part.  She also claims that Defendant breached the implied covenant of good faith and fair dealing, violated California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, and was unjustly enriched.

On June 30, 2008, the Court issued an order requiring Plaintiff to submit to the appraisal process specified in her insurance policy to determine the actual cash value of her vehicle. The Court also stayed these proceedings except with respect to adjudication of whether Defendant was required to comply with the TLR at the time it offered to settle Plaintiff's claim.  The Court permitted interim discovery on this matter only.

II.  History of the Total Loss Regulation

In July, 2003, the Personal Insurance Federation of California (PIFC) and other insurance industry trade associations sued the California Insurance Commissioner in the Los Angeles County Superior Court to block the TLR from going into effect.  Defendant is a member of PIFC.  The plaintiffs in the PIFC action objected, among other things, to the fact that the TLR required insurers to value total losses based on the asking price of comparable automobiles.  They asserted that this would lead to inflated valuations because vehicles are almost always sold for less than

---

[1]This figure compares Defendant's settlement offer to the value of her automobile based on the asking price of comparable vehicles.  It does not take into account that the TLR permits an insurer to conduct its valuation using either the asking price or the actual sales price of comparable vehicles.  Plaintiff does not specifically allege that Defendant's offer was less than the value of her automobile based on the actual sales price of comparable vehicles.

United States District Court
For the Northern District of California

the asking price.  A number of insurers had previously submitted comments raising these concerns to the CDI in response to the proposed TLR.  In responding to these comments, the CDI defended the reasonableness of its approach and explained the purpose of the relevant provision:

> [The TLR] does not require the use of asking price.  It permits the use of actual sales prices of the vehicle, which is the most accurate reflection of the market.  Use of the ask-price would only be an issue if the insurer or its representative chooses not to use actual sales prices.  The purpose of the regulations is to preclude the use of a "take-price".  The take-price methodology used by computerized automobile valuation companies results in unsupportable undervaluing of the vehicle.  The take-price is used by these companies to represent what they contend is a more accurate reflection of the actual sell price of a particular vehicle.  The basic assumption here is that the "ask price" is negotiated down during the sales process.  However, the CDI's investigation of consumer complaints and market conduct examinations shows that the take price of a comparable vehicle is based upon what the dealer would take in an all-cash purchase for that vehicle and is the lowest possible price a consumer could pay for that vehicle if he/she was a skilled negotiator.  The standard for valuing an automobile for purposes of paying insurance claims should not be the lowest possible price a consumer could pay for a car.  The value should be based upon what an average consumer, with average negotiating skills, would pay.

Pl.'s Req. for Judicial Notice (Docket No. 114) Ex. D at RMF-731.

The parties to the PIFC lawsuit ultimately negotiated a settlement.  During negotiations, the PIFC plaintiffs sent a letter to the CDI expressing their position on the use of the actual sales price of comparable vehicles in valuing total losses.  They stated, "The carriers agree that the actual sales price, if available, should be the measurement used.  The concern is that in the event the actual sales price is not available, these sections could be interpreted to limit the measurement to the ask price only, which would result in inflated valuations."  Sorich Dec. (Ex. 118) Ex. A

**United States District Court**
For the Northern District of California

1  at PIFC 0092.  In response, the CDI stated:

2      We fully understand, as we have discussed with you on
       several occasions, that you are not willing to agree to
3      the changes in 2695.8(b)(2) requiring the use of actual
       sales price . . . in total loss valuations, unless and
4      until actual sales price data is made available by the
       DMV.  We are therefore somewhat baffled as to why you
5      have to raise this issue again here.  We have been
       assured by the DMV that the data will be made available,
6      the only remaining question is when.  We are continuing
       to do everything we can to make sure that it happens as
7      soon as possible.

8  Id. Ex. B at PIFC 0085, 0079.

9      The parties to the PIFC lawsuit executed a stipulation of

10 settlement on June 4, 2004.  It provided in part:

11     With respect to the Revised Regulations, the Commissioner
       agrees that the language to be adopted in section
12     2695.8(b)(2), requiring insurers to determine the cost of
       a comparable automobile using either the ask price or
13     actual sales price of that vehicle, shall not become
       effective until sixty (60) days after sales price data
14     becomes available from the Department of Motor Vehicles.
       Prior to the time such sales price data becomes
15     available, all other provisions of section 2695.8(b)(2)
       of the Replacement Regulations shall be applicable to the
16     determination of the cost of a comparable automobile.  It
       is further agreed that within sixty (60) days of
17     automobile sales price data becoming available from the
       Department of Motor Vehicles, plaintiffs' member
18     companies shall determine the cost of a comparable
       vehicle by using either the actual sales price or the ask
19     price of a comparable automobile.

20 Id. Ex. G at 2 (emphasis added).  The court presiding over the PIFC

21 action entered the settlement agreement as an order on June 7,

22 2004.

23     Automobile insurers use total loss valuation vendors to

24 provide them with total loss valuation reports.  There are three

25 major vendors in California: CCC, Audatex and Mitchell.  Although

26 the settlement agreement appears to contemplate that the Department

27 of Motor Vehicles (DMV) would, on some future date, begin making

28 sales price data available to any valuation vendor that wanted it,

7

United States District Court
For the Northern District of California

the DMV had not made sales price data available to any such vendor by the time the agreement was executed, and had not finalized a plan to make such information generally available. CCC, however, had already entered into discussions with the CDI and the DMV to obtain data that could be used for total loss valuation reports, submitting a formal request for data in January, 2003. Because the DMV's vehicle registration database does not contain information on the exact sales prices of vehicles sold by auto dealerships, CCC agreed instead to receive information on vehicle license fees (VLF's), which can be cross-referenced with the DMV's fee schedule to identify a vehicle's sales price within a range of $200.[2] The DMV began providing VLF data to CCC in August, 2004. There is some evidence in the record that CCC uses the upper limit of the range to conduct its valuations.

The DMV initially intended to provide the same data feed to other valuation vendors as well, knowing that there would be "many requests for [sales price information] from the beginning" and not wanting to "recreate the wheel with each succeeding customer." Goodman Dec. Ex. 26. CCC, however, informed the DMV that it considered the protocols through which it interfaced with the DMV to obtain VLF data to be a trade secret. Accordingly, the DMV did not proceed with its plan and instead required each vendor to work with it to develop appropriate protocols for obtaining sales price data.

---

[2]When it first began receiving VLF data, CCC informed the DMV that it wanted data on exact sales prices. Although the record is not clear on this point, it appears that CCC ultimately agreed to accept VLF data after learning that the cost of obtaining exact sales price data would be extremely high.

United States District Court
For the Northern District of California

Although the record is not clear on the details, Audatex also took some steps to arrange to purchase sales price information from the DMV, filing a request in August, 2004.  It received a test file of VLF data from the DMV in November, 2004.  The company decided not to purchase the data, instead choosing to obtain information on actual sales prices from other sources.  However, Audatex's Rule 30(b)(6) witness testified that it was his impression that the final version of the data feed would have been available by the end of 2004.  Birka-White Reply Dec. Ex. 1 (filed under seal) at 25-30.

Mitchell did not attempt to obtain sales price information from the DMV before the PIFC lawsuit was settled.  It did not offer its total loss valuation service in its present form until late 2005, and insurers did not begin using it until early 2006. Mitchell filed a request for sales price data with the DMV in February, 2006.  In explaining the timing of the application, Mitchell's Rule 30(b)(6) witness stated, "[W]e were just initiating the process with the DMV to understand what we would need to do if we wanted to obtain the data.  And when we determined we needed the application to be filled out, that's what we did."  Birka-White Dec. (Docket No. 128) Ex. F at 138.  Because commercial requests like Mitchell's are a low priority, the DMV informed Mitchell that it might not begin work on the request for more than a year.  In July or August, 2007, Mitchell attempted to expedite the process by arranging for another company with an existing DMV account to purchase sales price data and re-sell it to Mitchell.  The DMV, however, was not amenable to this proposal.  For reasons that are not entirely clear, the DMV never acted on Mitchell's February,

2006 order.[3]  In September, 2007, Mitchell filed a new, modified request for vehicle registration information.  Mitchell apparently informed the CDI that it was unsatisfied with the DMV's progress in responding to its requests; in January, 2008, Tony Cignarale, the CDI Deputy Commissioner for Consumer Affairs and Market Conduct, sent an email to the DMV General Counsel noting the difficulty Mitchell had been experiencing with obtaining sales price information from the DMV.  Cignarale asked the General Counsel for assistance in expediting the DMV's response to Mitchell's request.

Mitchell began receiving a data feed from the DMV with VLF information in May, 2008.  Mitchell's Rule 30(b)(6) witness testified at his deposition that he was surprised to receive information concerning a range of sales prices rather than the exact sales prices.  However, the CDI informed Mitchell that the agency would be satisfied if Mitchell used the midpoint of the range in conducting valuations.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.

---

[3]Plaintiff maintains that the DMV "dropped" Mitchell's application when Mitchell "failed to pursue it," and a DMV document states that communication with Mitchell "ceased in March 2006." Id. Ex. L at DMV000095.  However, there is no evidence that the DMV "dropped" the request when communication "ceased," and the DMV's Rule 30(b)(6) witness, in interpreting the document, declined to fault Mitchell for failing to follow through with the application process.  Id. Ex. D at 162.  It appears that Mitchell initially shifted its focus to obtaining the DMV's VLF information through the other company rather than through its original request. Shortly after the DMV rejected this approach, Mitchell filed an updated request to obtain the information itself.

United States District Court
For the Northern District of California

56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986);

<u>Eisenberg v. Ins. Co. of N. Am.</u>, 815 F.2d 1285, 1288-89 (9th Cir.

1987).

The moving party bears the burden of showing that there is no

material factual dispute.  Therefore, the court must regard as true

the opposing party's evidence, if it is supported by affidavits or

other evidentiary material.  <u>Celotex</u>, 477 U.S. at 324; <u>Eisenberg</u>,

815 F.2d at 1289.  The court must draw all reasonable inferences in

favor of the party against whom summary judgment is sought.

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,

587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d

1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment

are those which, under applicable substantive law, may affect the

outcome of the case.  The substantive law will identify which facts

are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

(1986).

DISCUSSION

To determine whether Defendant was required to comply with the

TLR at the time it offered to settle Plaintiff's claim, the Court

must interpret the provision in the PIFC settlement agreement

stating that "the language to be adopted in section 2695.8(b)(2),

requiring insurers to determine the cost of a comparable automobile

using either the ask price or actual sales price of that vehicle,

shall not become effective until sixty (60) days after sales price

data becomes available from the Department of Motor Vehicles."  The

resolution of this motion turns on the meaning of the terms "sales

price data" and "available."  The parties proffer diametrically

11

opposed interpretations of the provision.  In Plaintiff's view, the regulation became effective for all insurers sixty days after the DMV began providing VLF information to CCC.  According to Defendant, the regulation will not become effective for any insurer until the DMV has established a system to make exact sales price information immediately available to any valuation vendor that requests it.

In interpreting the settlement agreement, the Court must keep in mind the purpose of the condition that the relevant TLR provision would go into effect only after sales price data became available, and must determine how events subsequent to the settlement relate to that purpose.  Evidence of the settlement negotiations may inform the Court's decision.  However, the fact that the parties to the PIFC action may have believed that sales price information would be made available in a form or manner that never materialized provides no basis for invalidating the agreement, as Defendant argues.  The agreement was entered as an order of the court that presided over the PIFC action.  Even if events unfolded in a way that the parties to the PIFC action did not foresee, the state court ordered that the TLR provision would take effect sixty days after sales price data became available.  If this were an action for breach of the settlement agreement, Defendant could potentially invoke mutual mistake of fact as a bar to contract formation and seek to have the agreement rescinded. But this is not a contract action, and the only issue is whether the precondition specified by the state court has been satisfied.

The first question in resolving this issue is whether the $200 range of sales prices that can be derived from the DMV's VLF codes

United States District Court

For the Northern District of California

constitutes "sales price data," particularly considering the TLR's requirement that insurers use the "actual sale price" of comparable vehicles in conducting valuations.  The VLF information is "data" that can be used to identify the "actual sale price" of a specific vehicle -- albeit within a $200 range -- as opposed to a hypothetical "take price" derived by a computer model, the use of which the TLR was designed to prohibit.  The VLF data thus falls within the plain meaning of the agreement and the TLR.  Moreover, the CDI takes the position that VLF data relates to "actual sale prices," and thus can be used to conduct valuations in accordance with the TLR.  Defendant's approach would impose a requirement, found neither in the agreement nor in the regulation, and not imposed by the CDI, that the data reflect <u>exact</u> actual sales prices.  As the CDI recognizes, the range of prices provided by the VLF data is narrow enough that it can easily be used to conduct valuations.  Here, for example, $200 was only 1.25 percent of the amount for which Defendant offered to settle Plaintiff's total loss claim.  And if Mitchell were to use the mid-point of the range, as the CDI has said it may do, it would never be more than $100 off the exact sales price.  It is true that a much greater range of prices would not be a suitable basis for valuations conducted under the TLR.  The Court need not determine at what point a price range would become unsuitable, however, because the $200 range at issue in this case <u>is</u> suitable and is accepted by the agency in charge of enforcing the TLR.

        Defendant asserts that extrinsic evidence supports its interpretation of "actual sale price" as "exact actual sale price." However, the extrinsic evidence demonstrates that the TLR was

13

intended to preclude the use of a hypothetical "take price" derived from a computer model.  Interpreted in this context, the word "actual" must be understood as the opposite of "hypothetical," not as requiring exactitude.  Nothing about the VLF data is hypothetical.  Furthermore, Defendant has pointed to no evidence that all of the parties to the PIFC action understood the provision in the settlement agreement to be triggered only when the DMV made data on "exact" sales prices available.  Although Defendant has submitted declarations from negotiators on behalf of PIFC, the declarants merely state that the CDI represented during negotiations that the DMV maintained "actual sales price data" and would make it available.  Colborn Dec. (Docket No. 116) ¶ 10; Sorich Dec. (Docket No. 118) ¶ 11.  Defendant has not submitted any evidence that the CDI told negotiators that the DMV would make <u>exact</u> sales price information available, or that PIFC representatives ever objected to the possibility that the DMV would produce data that could used to identify a narrow range of sales prices.  As Defendant acknowledges, Mr. Cignarale, who represented the CDI in the negotiations, in fact anticipated that the DMV would provide a VLF code rather than exact sales figures.  See Goodman Dec. Ex. 1 at 112-14.

Moreover, even if the parties to the settlement agreement had been under the impression that the DMV would provide exact sales price information, this fact would provide no basis for interpreting the settlement agreement in a way that would effectively prevent the TLR from ever going into effect.  The PIFC plaintiffs' desire to delay implementation of the "asking price or actual sale price" provision was driven by their concern that the

14

regulation would force them to rely on asking prices because information on actual sales prices would not be available.  Because the CDI has decided that insurers can comply with the "actual sale price" prong of the provision by using VLF data, the PIFC plaintiffs do not have to rely on asking price.  Finding that the provision has gone into effect would not result in the situation the PIFC plaintiffs sought to avoid.

For these reasons, the Court finds that the VLF data that CCC began receiving in August, 2004 and Mitchell began receiving in May, 2008 was "sales price data" within the meaning of the settlement agreement, as incorporated in the state court's order.

The second question is whether, when Mitchell valued Plaintiff's vehicle in April, 2007, sales price information was "available" so as to satisfy the condition in the settlement agreement.  The agreement did not specify to whom the information had to be made available.  It is possible that the parties assumed that the DMV would make sales price information available to all valuation vendors simultaneously.[4]  However, it is clear that the DMV was not able to go forward with any plan it may have been developing to make the information generally available.  Accordingly, sales price information did not become "available" to any given vendor until that vendor applied for VLF data from the DMV and, some time later, received it.

_____

[4]Kent Kellner, an attorney who represented the PIFC plaintiffs during the settlement negotiations, testified at his deposition that he "received the understanding" from "somebody" at the CDI, though he could not say whom or when, that "this was all going to commence at one time" and sales price information would "become available to all insurers."  Goodman Dec. (Docket No. 115) Ex. 3 at 89.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

At the time the parties to the PIFC action were negotiating a settlement, there were only two total loss valuation vendors that were seeking information on actual sales prices: CCC and Audatex. It is reasonable to assume that the PIFC plaintiffs were concerned about delaying the effective date of the TLR provision until these vendors, and not some hypothetical future vendor, had access to sales price information; once these vendors had access to the information, the PIFC plaintiffs would be able to comply with the "actual sale price" prong of the provision. Given this concern, the agreement must be interpreted as providing that the "asking price or actual sale price" provision would go into effect once VLF information was made available to CCC and Audatex, provided those companies were reasonably diligent in seeking the data from the DMV.

When the state court entered the settlement agreement as an order on June 7, 2004, CCC was actively working with the DMV to obtain data that would enable it to comply with the "actual sale price" prong of the TLR provision. It had submitted an application for sales price data in January, 2003 and began receiving VLF data in August, 2004. Audatex did not submit an application for data from the DMV until August, 2004, after the state court's order had been entered. Although it is not clear from the record whether and to what extent Audatex worked with the DMV to obtain information before submitting its formal application, for the sake of argument, the Court will assume that Audatex was diligently pursuing the matter at the time the settlement was reached. Audatex was provided with test data in November, 2004 but decided not to purchase the VLF data from the DMV, choosing instead to rely on

16

other sources of information about actual sales prices.[5]  If
Audatex had decided to purchase the data, the data likely would
have been available by the end of 2004.

The Court need not decide whether the VLF data became
"available" in August, 2004, when CCC began receiving the data, or
in approximately December, 2004, when Audatex would have begun
receiving the data had Audatex decided to purchase it; under either
scenario, the VLF data had become available by the time Mitchell
began offering its total loss valuation product in late 2005.  The
provision had thus entered into effect by the time Defendant chose
to retain Mitchell to perform total loss valuations, and Defendant
was required to comply with the provision when it valued
Plaintiff's automobile in April, 2007.

As noted above, Defendant argues that the TLR will not go into
effect until the DMV has arranged for sales price data to be
immediately available to any vendor who requests it.  The DMV has
no plans to create such a system, though, and accepting Defendant's
argument would mean that the TLR would, as a practical matter,
never go into effect.  The settlement agreement was intended to
delay the effective date of the TLR until the valuation vendors who
were attempting to obtain actual sales price data at the time were
able to do so, thereby addressing the PIFC plaintiffs' concern that
they would be forced to value total losses based on asking prices.

---

[5]Defendant's papers suggest that Audatex decided not to
purchase the information because it was "unusable."  This is not an
accurate description of events, and the isolated portions of
deposition transcripts that Defendant cites do not support its
position.  Audatex considers the true reason for its decision,
which is not relevant to the issues before the Court, to be
confidential.

Once CCC and Audatex had access to the VLF data, the situation the PIFC plaintiffs feared was no longer a possibility; any insurer could comply with the "actual sale price" prong by using the services of one of these vendors.

Defendant maintains that it cannot reasonably be expected to have complied with the TLR during the period in which Mitchell had sought VLF data from the DMV but had not yet received it.  But regardless of whether Mitchell had access to the data it needed to conduct valuations based on actual sales prices, it is undisputed that other vendors did have access to such data at the time. Nothing prevented Defendant from complying with the TLR, either by instructing Mitchell to use asking price as a basis for conducting valuations or by using the services of a vendor that was capable of conducting valuations based on actual sales prices.  In fact, although it is not clear from the record, Defendant represented at the hearing that it chose to switch from Audatex -- a company that was apparently performing valuations by relying on sales price data, though not data obtained from the DMV -- to Mitchell, even though Defendant knew or should have known that Mitchell's valuations were not conducted in compliance with the TLR, and that Mitchell could not conduct valuations based on actual sales prices until Mitchell was able to obtain sales price data from the DMV. Defendant cannot invoke Mitchell's failure to obtain sales price data before it began offering its new product as an excuse for its own failure to comply with the TLR.

The Court concludes that the "asking price or actual sale price" provision of the TLR was in effect at the time Defendant offered to settle Plaintiff's total loss claim.

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's motion for summary judgment (Docket No. 113) and GRANTS Plaintiff's cross-motion for summary adjudication (Docket No. 127) of the issue discussed herein.

IT IS SO ORDERED.

Dated: 3/23/09

_____
CLAUDIA WILKEN
United States District Judge